**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**

**BRYAN KEITH RICHARDSON,**

      **Plaintiff,**

**v.**
                        **Civil Action No. 2:14CV64**
                        **(Judge Bailey)**

**MR. SMITH, Associate Warden of Prison Operations,**
**MR. RUSSELL A. PERDUE, Warden, et al.,**

      **Defendants**

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

On August 14, 2014, Bryan Richardson [hereinafter Plaintiff], a federal inmate, initiated this case by filing a *pro se* Bivens[1] complaint, together with a Motion for Leave to Proceed *in forma pauperis* and supporting documentation. On September 9, 2014, Plaintiff was sent a Deficiency Notice by now retired Magistrate Judge Kaull, requiring him to file an updated Prisoner Trust Account Report ("PTAR"). On September 23, 2014, Plaintiff filed the required PTAR, and on September 24, 2014, he was granted leave to proceed *in forma pauperis* with a required initial partial filing fee of $33.61. On October 14, 2014, Plaintiff paid his required initial partial filing fee. On March 3, 2015, Plaintiff's Motion to Amend/Correct was granted. On March 23 2015, Plaintiff filed

---

[1] Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388 (1971), a case in which the Supreme Court created a counterpart to 42 U.S.C. §1983 and authorized suits against federal employees in their individual capacities. A Bivens action "must be founded upon a violation of constitutional rights." See Anderson v. Peters, 829 F.2d 671, 676 (8th Cir. 1987).

a "Motion to Strike" the Court's Order granting him leave to amend, which noted that Plaintiff did not wish to amend his complaint to add additional defendants.

In his complaint, Plaintiff alleges that while housed at FCI Gilmer, he was subjected to cruel and unusual punishment in violation of the Eighth Amendment by being placed on a "hitching post" where he was deprived of shelter from adverse weather conditions, which caused his chronic health conditions to worsen. More specifically, he alleges that he was placed on the "hitching post" on December 23, 2013; April 19, 2014; and April 22, 2014. In addition, Plaintiff alleges that when he filed grievances against staff, Bureau of Prisons ("BOP") employees retaliated against him by sending him to the "hitching post," verbally abusing him, increasing his Inmate Financial Responsibility Program ("IFRP") payments, issuing a false disciplinary report against him, sending him to the Special Housing Unit ("SHU"), and freezing his inmate pay. Plaintiff maintains that this retaliation was undertaken to both punish him for and dissuade him from filing administrative grievances.

Plaintiff names as defendants current and former FCI Gilmer employees: former Warden Russell Perdue; Associate Warden Michael Smith; Lieutenant Rixey Yarber; Unit Secretary Joseph Jeager; Unit Manager Joanne Parke-Davison; Health Services Administrator Michael Weave; retired Supervisor of Education Robert Clark; Senior Officer Timothy Beck; Supervisor of Education Marsha Thompkins; and Correctional Counselor Craig Taylor.

For relief, Plaintiff seeks an order prohibiting the Federal BOP employees at FCI Gilmer from putting him on the "hitching post," or requiring FCI Gilmer to install a shelter over the "hitching post" that includes a bathroom and water fountain. Plaintiff also seeks $100,000 in compensatory damages; $100,000 in punitive damages; a transfer from FCI Gilmer, and an order

preventing FCI Gilmer staff from retaliating against him.

On May 12, 2015, now retired Magistrate Judge Kaull conducted a preliminary review of this matter and determined that summary dismissal was not appropriate. Accordingly, an Order was entered directing the Clerk to issue 60-day summonses for the named Defendants and providing for service through the United States Marshals.

On August 28, 2015, Defendants filed a Motion to Dismiss or for Summary Judgment in lieu of an Answer. In support of their Motion, Defendants contend that Plaintiff has failed to exhaust his administrative remedies with respect to his claim that he was overexposed to the weather for hours when Defendant Yeager sent him to the "hitching post" on December 24, 2013; his claim that Defendant Weaver sent him to the "hitching post" on April 22, 2014; his claim regarding his inmate pay being frozen; or any claim regarding the supervisory defendants. In addition, Defendants allege that Plaintiff's allegations regarding cruel and unusual punishment with respect to the "hitching post" are without merit. Defendants also allege that Plaintiff's claims regarding retaliation fail as a matter of law. Additionally, Defendants allege that Plaintiff cannot recover for emotional or psychological damage without a showing of physical injury, and Defendants are entitled to qualified immunity. Finally, Defendants allege that because Plaintiff has been moved to another facility, his claims for injunctive relief must be dismissed as moot.

On August 31, 2015, a Roseboro Notice was issued. On September 28, 2014, Plaintiff filed a Memorandum of Law in Opposition to Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment. ECF. No. 84. Plaintiff's Memorandum consists of twenty-six pages, which primarily restate his claims. Plaintiff stresses that although Defendants were aware that he suffered from chronic-acute life threatening health conditions, they nevertheless imposed illegal and

harmful disciplinary actions that subjected him to a high risk of great bodily harm. Moreover, Plaintiff asserts that he has always specifically alleged that Defendants were completely aware that he suffered from serious medical conditions; however, he now alleges that Defendants did not know that he was suffering from a cancerous lung tumor in his right middle lung. Accordingly, in his response, Plaintiff alleges that "the intentional acts of the defendant's (sic) subjecting the plaintiff's lungs to 'over exposure' to the extreme adverse weather conditions, without him wearing any proper protective clothing (coat, wool cap, or gloves), DID and WOULD cause GRAVE HARM TO HIS CANCEROUS TUMOR." ECF No. 84-4 (emphasis in original). Plaintiff also alleges that Defendants invoked and harbored "the spirit of 'Dred Scott,' in their absolutist implementation of leaving [him] affixed to a 'Hitching Post Bench,' for unreasonable amounts of time, without providing him with any shelter, protective clothing, water to drink, nor the ability to use any toilet facility." Id. at 5-6.

Also pending is Plaintiff's Motion for an Evidentiary Hearing [ECF No. 82]; Plaintiff's Motion to Dismiss or, in the alternative, Motion for Summary Judgment[2] [ECF No. 87]; Plaintiff's Motion for a Writ of Habeas Corpus ad testificandum [ECF No. 89]; Plaintiff's Motion for Appointment of Counsel [ECF No. 90]; and Plaintiff's Motion for Writ of Habeas Corpus ad testificandum {ECF No. 91].

## II. STANDARD OF REVIEW

### A. Motion to Dismiss

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows a defendant to challenge the

---

[2]In fact, this is better characterized as simply a Motion for Summary Judgment.

complaint's sufficiency in this regard by moving to dismiss a complaint for failing "to state a claim upon which relief can be granted." To survive a Rule 12(b)(6) motion, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Although Rule 8's pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Thus, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertions' devoid of 'further factual enhancements.'" Id. (quoting Twombly, 550 U.S. at 555, 557).

When reviewing a Rule 12(b)(6) motion, courts assume that the complaint's well-pleaded allegations are true, resolve all doubts and inferences in favor of the plaintiff and view the allegations in a light most favorable to the plaintiff. Edwards, 178 F.3d at 243-44. Only factual allegations receive the presumption of truth. Iqbal, 556 U.S. at 678-79. A court may also consider facts derived from sources beyond the four corners of the complaint, including documents attached to the complaint, documents attached to the motion to dismiss "so long as they are integral to the complaint and authentic" and facts subject to judicial notice under Federal Rule of Evidence 201. Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009).

**B. Summary Judgment**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, the Court must conduct "the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.

The party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). That is, once the movant has met its burden to show an absence of material fact, the party opposing summary judgment must then come forward with affidavits or other evidence demonstrating there is indeed a genuine issue for trial. Fed. R. Civ. P. 56; Celotex Corp., 477 U.S. at 323-25; Anderson, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249 (citations omitted). A motion for summary judgment should be denied "if the evidence is such that conflicting inferences may be drawn therefrom, or if reasonable men might reach different conclusions." Phoenix Savs. & Loan, Inc. v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967); see also Anderson, 477 U.S. at 253 (noting that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge").

### III. Analysis

#### A. Supervisory Liability

In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the United States Supreme Court abolished supervisory liability under Bivens. "Government officials may not be held liable for the

unconstitutional conduct of their subordinates under a theory of *respondeat superior*." Iqbal, 556

U.S. at 676. "Because *vicarious liability* is inapplicable to Bivens and § 1983 suits, a plaintiff must

plead that each Government-official defendant, through the official's own individual actions, has

violated the Constitution." Id. The Court held that "[i]n a § 1983 suit or a Bivens action – where

masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer.

Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable

for his or her own misconduct." Ashcroft, 556 U.S. at 697. Moreover, the Court rejected the

argument that "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts

to the supervisor's violating the Constitution," and found that "purpose rather than knowledge" was

required to impose liability. Id.

In this case, Plaintiff does not allege any personal involvement on the part of Defendants

Russell A. Perdue and Mr. Smith. Instead, it appears that Plaintiff has named them merely in their

supervisory capacity as the warden and associate warden of FCI Gilmer.[3]   Accordingly, these two

Defendants are due to be dismissed.

### B. Exhaustion of Administrative Grievances

Under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect

to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available

administrative remedies. 42 U.S.C. § 1997(e)(a). Exhaustion as provided in § 1997(e)(a) is

mandatory. Booth v. Churner, 532 U.S. 731, 741 (2001). A Bivens action, like an action under 42

U.S.C. § 1983, is subject to the exhaustion of administrative remedies. Porter v. Nussle, 534 U.S.

---

[3] To the extent Plaintiff may be asserting that these Defendants  violated his constitutional rights
by denying his administrative grievances, that claim is without merit.  This is not the type of personal
involvement required to state a Bivens claim.  See Paige v. Kupec, 2003 WL 23274357 *1 (D.Md. March
31, 2003).

516, 524 (2002). The exhaustion of administrative remedies "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes,"[1] and is required even when the relief sought is not available. Booth, 532 U.S. at 741. Because exhaustion is a prerequisite to suit, all available administrative remedies must be exhausted prior to filing a complaint in federal court. *See* Porter, 534 U.S. at 524 (citing Booth, 532 U.S. at 741) (emphasis added).

Moreover, in Woodford v. Ngo, 548 U.S. 81, 84-85 (2006), the United States Supreme Court found that the PLRA's exhaustion requirement serves three main purposes: (1) to "eliminate unwarranted federal court interference with the administration of prisons"; (2) to "afford corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case"; and (3) to "reduce the quantity and improve the quality of prisoner suits." Therefore, "the PLRA exhaustion requirement requires full and proper exhaustion." Woodford, 548 U.S. at 92-94 (emphasis added). Full and proper exhaustion includes meeting all the time and procedural requirements of the prison grievance system. Id. at 101-102.

The Bureau of Prisons has established a three-tier Administrative Remedy Procedure, set forth in Title 28 of the Code of Federal Regulations, for the formal review of complaints filed by inmates relating to the conditions of their confinement. 28 C.F.R. § 542.10, *et seq.*. Under this system, an inmate must first request an informal resolution by presenting an issue of concern informally to a staff member. 28 U.S.C. § 542.13(a). If the informal resolution fails, or if an inmate is dissatisfied with the informal response, or if there is **no** response, the inmate may then submit a Request for Administrative Remedy, in the form of a formal written complaint, on the proper form (a BP-9), to the Warden of the institution within twenty (20) calendar days of the date of the incident

_____

[1] Id.

upon which the complaint is based. 28 C.F.R. § 542.14(a). If the inmate's request is denied; if the inmate is dissatisfied with the Warden's response; or if there is no response from the Warden within twenty (20) days, the inmate may file an appeal with the appropriate Regional Office for the geographic region in which the inmate's institution of confinement is located,[2] using the appropriate form (a BP-10), within twenty (20) calendar days of the Warden's response or the date the response would have been due.[3] 28 C.F.R. §§ 542.18; 542.15(a). If the Regional Office denies relief, the inmate completes the administrative remedy process by appealing the decision to the Office of General Counsel, or the "Central Office," in Washington, D.C., using the appropriate form (a BP-11), within thirty (30) calendar days of the date the Regional Director signed the response. Id. The General Counsel's written response to the inmate's appeal is the final decision of the administrative remedy process, and an inmate is not deemed to have fully exhausted his or her administrative remedies until the request has been filed and acted upon at all the required agency levels. Id.

Within the BOP record-keeping system, each administrative remedy request is assigned a six-digit numerical ID, or case number, as well as an alpha-numeric suffix. For each specific remedy request, the numerical ID, or case number, remains the same, while the alpha-numeric suffix may change, depending upon the progression of the request through the various levels of administrative review. The alpha portion of the suffix indicates the specific level of the administrative review process. Thus, the suffix "F" identifies a remedy request at the institutional (the facility) level, while the letter "R" represents the Regional Office level, and the letter "A" indicates the General Counsel,

---

[2] For inmates confined at FCI Gilmer, those appeals are sent to the Mid-Atlantic Regional Director in Annapolis Junction, Maryland.

[3] If the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level. § 542.18.

or the Central Office level. The numeric portion of the suffix indicates the number of times that particular administrative grievance has been filed at a specific level. For example, "F1," indicates the inmate has filed once at the institutional level. If the inmate is rejected at that level and re-files at the same level, the suffix would be "F2."[4]

Defendants acknowledge that Plaintiff has fully exhausted his administrative grievances regarding his complaint that Defendant Yeager used unprofessional language against him on December 24, 2013 (Administrative Remedy ID No. 765214); regarding his IFRP payment being increased in April of 2014 (Administrative Remedy ID No. 776896); regarding the incident report he received for being in insolent on April 19, 2014 (Administrative Remedy ID No. 778237); regarding the alleged improper placement in the SHU by Defendant Yarber ( Administrative Remedy ID No. 780611); and regarding his claim of being left on the Lieutenant's bench by Defendant Park-Davison on April 19, 2014 (Administrative Remedy ID No. 780612). ECF No. 74-1 at 2.

However, Defendants contend that Plaintiff did not exhaust his claims that he was overexposed to the weather for hours when Defendant Yeager sent him to the Lieutenant's bench on December 24, 2013; any claim that Defendant Weaver sent him to the Lieutenant's bench on April 22, 2014; any claim regarding his inmate pay having been frozen; or any claim regarding the supervisory defendants. Id. at 3.

Nowhere in Plaintiff's Memorandum of Law in Opposition does Plaintiff attempt to refute Defendant's assertion that he failed to exhaust his administrative remedies against the supervisory Defendants or his claim that his inmate pay was frozen. For the reasons stated above, Plaintiff's

---

[4]See generally Declaration of Sharon Wahl. ECF No. 74-1 at 2.

claims against the supervisory defendants, Perdue and Smith, are due to be dismissed regardless of exhaustion of administrative remedies. In addition, because Plaintiff has offered nothing to refute Defendants' assertion that he failed to exhaust his administrative remedies regarding his pay being frozen, the claim against Defendant Beck is due to be dismissed without prejudice.[5]

However, Plaintiff asserts that he did exhaust his administrative remedies with respect to Defendant Yeager sending him to the Lieutenant's bench on December 24, 2013, and his claim that Defendant Weaver sent him to the Lieutenant's bench on April 22, 2014. Plaintiff maintains that his Administrative Remedy ID No. 780612 related to the usage of the "hitching post" by all correctional staff who worked at FCI Gilmer from the dates of December 24, 2013, through July 10, 2014. Although Defendants supplied the entirety of some of the administrative remedies in their Attachment A to Exhibit 1, they did not include any portion of Remedy ID No. 780612. The BP-9 associated with this remedy was received at the facility (warden's level) on May 27, 2014, more than twenty (20) days after each of the three specific incidents complained about by Plaintiff in his complaint. Accordingly, the remedy could have been rejected as untimely but was not. It is unclear why Defendants acknowledge that this Remedy exhausted Plaintiff's claim regarding the April 19, 2014, incident but not the December 24, 2013, or April 22, 2014, incident. While a review of the specific language of the BP-9 might provide the Court with affirmative evidence that said grievance related only to the April 19, 2014 incident, Defendants chose not to provide a copy. In Jones v. Bock, 549 U.S. 199 (2007), the United States Supreme Court ruled, among other things, that an inmate's failure to exhaust under the PLRA is an affirmative defense, and an inmate is not required

---

[5]In his complaint, Plaintiff alleges that Mr. Beck, Prison Education Specialist, used his job position to retaliate and freeze his pay at the lowest level indefinitely. ECF No. 1 at 4–5.

to specifically plead or demonstrate exhaustion in his complaint. The burden is on Defendants to establish non-exhaustion, and the undersigned finds they failed to meet that burden. Accordingly, the undersigned has, as set more fully below, addressed each of the three incidents under the Eighth Amendment's prohibition against Cruel and Unusual Punishment.

## C. Injunctive Relief

Article III of the United States Constitution limits the jurisdiction of the federal courts to cases or controversies. Therefore a case becomes moot when there is no viable legal issue left to resolve. See Powell v. McCormick, 395 U.S. 486, 496 (1969). If developments occur during the course of a case which render the Court unable to grant a party the relief requested, the case must be dismissed as moot. Blanciak v. Allegheny Ludlum Co., 77 F.3d 690, 698-699 (3d Cir. 1996).

In addition to monetary damages, Plaintiff requests that this Court order various forms of injunctive relief. Specifically, he requests that (1) FCI Gilmer employees be prevented from putting him on the "hitching post"; (2) FCI Gilmer be required to build a shelter over the bench that includes a bathroom and drinking water; (3) he be transferred to another facility; and (4) FCI Gilmer employees be prevented from retaliating against him. However, "a claim for injunctive or declaratory relief must be dismissed as moot where the relief sought would, if granted, not make a difference to the legal interests of the parties." See Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) (prisoner's injunctive and declaratory relief claims moot on account of inmate's transfer); Magee v. Waters, 810 F.2d 451, 451 (4th Cir. 1987) (transfer to another institution rendered inmate's request for injunctive relief moot).

On March 20, 2015, Plaintiff advised the Court that he had been transferred to FCI Allenwood, which is located in White Deer, Pennsylvania. ECF No. 37. On July 13, 2015, Plaintiff

submitted another change of address indicating that he had been transferred to USP Beaumont, which is located in Beaumont, Texas, and according to the BOP website, he remains incarcerated at USP Beaumont. Accordingly, because Plaintiff has been transferred from FCI Gilmer, his claims for injunctive relief are moot.[6]

## D. Cruel and Unusual Punishment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. It not only outlaws excessive sentences but also protects inmates from inhumane treatment and conditions while imprisoned. A determination of whether the Eighth Amendment has been violated requires an analysis of both subjective and objective components. See Wilson v. Seiter, 501 U.S. 294, 302 (1991). Specifically, Eighth Amendment analysis requires inquiry into whether the prison official acted with a sufficiently culpable state of mind (subjective component) and whether the deprivation suffered or injury inflicted on the inmate was sufficiently serious (objective component). What must be established with regard to each component "varies according to the nature of the alleged constitutional violation." Hudson v. McMillian, 503 U.S. 1, 5 (1992). However, to prevail on a conditions of confinement claim, only extreme deprivations satisfy the objective component. Plaintiff must either demonstrate that he sustained a serious or significant physical or emotional injury, or a substantial risk of serious harm resulting from the challenged conditions. See Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995) (internal citations omitted).

In this case, Plaintiff's allegations of cruel and unusual punishment involve three separate

---

[6]However a prisoner's subsequent transfer from a complained-of prison, while it moots a request for declaratory and injunctive relief, it does not moot a request for monetary damages. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991) *quoting* Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986). Moreover, even in the absence of a showing of actual injury, a prisoner would still be entitled to nominal damages upon proof of a constitutional violation. Gray v. Spillman, 925 F.2d 90, 93–94 (4th Cir. 1991).

occasions when he was sent to the "hitching post." First, there appears to be no dispute that the "hitching post" is a park-like bench that is located on the concrete section of the yard at FCI Gilmer. It clearly does not have any shelter covering it. Moreover, it does not appear that there is a water fountain adjacent to it or a restroom. ECF No. 74-5. According to Defendants, it is situated directly in front of the Lieutenant's office where inmates have access to a restroom and water fountain. Defendants note that although Plaintiff refers to it as the "hitching post," inmates are not secured to it anyway. Defendants maintain that inmates sitting on the bench may get up, knock on the Lieutenant's office door, or tell any of the numerous staff members walking past that area that they need to use the facilities or want a drink. ECF No. 74-4 at 2.

The first date Plaintiff identifies that he was placed on the "hitching post" is December 24, 2013. Plaintiff maintains that Defendant Yeager placed him on the "hitching post" for an unreasonable amount of time, to be left over exposed to the adverse weather conditions without allowing him to wear his coat, cloves or even a wool cap to protect him from the freezing weather. Plaintiff maintains, as a result, he was seriously harmed with a severe cold and was gravely ill for the next two weeks without being given any medical attention. ECF No. 84 at 12–13.

In response, Defendant Yeager, who is a Unit Secretary at FCI Gilmer, has supplied an affidavit in which he state that he recalls sending two inmates to the Lieutenant's bench during an inmate move on December 24, 2013. Defendant Yeager recalls that he had instructed an inmate to remove his hat while indoors. Another inmate challenged his correction of the first inmate. The challenging inmate used profanity and told Defendant Yeager to leave the other inmate alone. Defendant Yeager indicates that he instructed both inmates to go to the Lieutenant's bench where he planned to address the insolence after the inmate move was over. Defendant Yeager states that

both inmates went toward the bench, and he continued his duties. Defendant Yeager further avers that inmate moves last only about ten minutes, and the move had already started when he instructed the inmates to go to the bench. Prior to the move's conclusion, one of the inmates came back to Defendant Yeager and apologized, and so he was allowed to continue on to his unit. When the move was over, approximately five minutes after Defendant Yeager sent the inmates to the bench, he went to the Lieutenant's bench so he could obtain the other inmate's information and write him an incident report for his insolence. However, the inmate was already gone because the compound officer had instructed the inmate to go to his housing unit. Defendant Yeager notes that he did not know who the inmate was, as he had not yet obtained his ID card. Therefore, Defendant Yeager is not sure who either inmate was, but if the inmate on the bench was Plaintiff, he was only there for approximately five minutes. ECF No. 74-3.

The second date Plaintiff identifies is April 19, 2014, when he alleges Defendant Parke-Davison was standing outside the dining room. Plaintiff alleges he approached a staff member standing beside Parke-Davison, who Plaintiff believed to be her supervisor and began discussing his IFRP payments. Plaintiff alleges that Defendant Parke-Davison then intentionally placed him on the "hitching post" for an unreasonable amount of time, to be left over exposed to the adverse weather conditions and without providing him with any shelter, drinking water or toilet facility to use. Plaintiff maintains that because of this cruel and unusual disciplinary punishment in the blazing hot weather he suffered a sunburn, dehydration and easily could have died. ECF No. 84 at 13.

In her responsive affidavit, Defendant Parke-Davison acknowledges that Plaintiff attempted to speak to the staff member standing beside her about his IFRP payments. Defendant Parke-Davison indicates that she knew Plaintiff was aggravated about his payments under the IFRP and

that the other staff member was not responsible for setting his payment. Therefore, she informed

Plaintiff that his unit team had already addressed his issue and the matter was settled. However,

Plaintiff ignored her attempts to speak with him and continued to try to get the other staff member

involved. Defendant Parke-Davison further notes that Plaintiff refused to answer her direct

questions, and she informed him that his refusal was inappropriate. Thereafter, Plaintiff was

instructed to go to the Lieutenant's bench, although Defendant Parke-Davison denied that she was

the staff member who instructed him to go there. Defendant Parke-Davison acknowledges that she

wrote an incident report against Plaintiff for being insolent to staff. Defendant Parke-Davison

further acknowledges that Plaintiff was found to have committed the disciplinary infraction by the

Unit Discipline Committee.[7] Finally, Defendant Parke-Davison recalls seeing Plaintiff sitting on

the bench afterwards and further recalls him yelling across the compound to another inmate

discussing why he was sitting on the bench. Defendant Parke-Davison notes that Plaintiff did not

appear to be in any distress, nor did he make any request of her for water or to use the bathroom.

ECF No. 74-6.

The final incident identified by Plaintiff occurred on April 22, 2014, when Plaintiff alleges

Defendant Weaver placed him on the "hitching post" for an unreasonable amount of time without

providing him with shelter, drinking water or a toilet facility. Plaintiff maintains that the weather

that day was rainy and cold, and because of Defendant Weaver's actions he "caught a touch of

pneumonia (severe cold) and suffered from a fever and chills." ECF No. 84 at 13. Plaintiff further

alleges that Defendant Weaver's actions also caused harm to his then unknown cancerous tumor and

---

[7]Plaintiff was disciplined with 90 days loss of commissary, visitation and telephone. ECF No. 74-7 at 2.

was the direct cause of his tumor increasing in size and the fluid that remains in the injured area of his lung. Id.

In response, Defendant Weaver has suppled an affidavit in which recalls that there was a group of inmates who failed to show up for their scheduled medical appointments. Because the inmates were not where they were suppose to be, Defendant Weaver called them to the medical department and gave them the option of performing extra duty by picking dandelions out of the compound grass to avoid disciplinary action. Defendant Weaver indicate that all of the inmates complied except for Plaintiff, who became belligerent. Therefore, he was escorted to the Lieutenant's bench to be counseled by the Lieutenant as to his behavior. Defendant Weaver concludes by indicating that it was then the Lieutenant's discretion to determine what measure, if any, would be taken at that time. ECF No. 74-8.

The undersigned notes that throughout his complaint and his response to the Defendants' Motion to Dismiss or for Summary Judgment, Plaintiff refers to being placed on the "hitching post" for hours upon hours or for an unreasonable amount of time. In addition, he makes conclusory allegations that he suffered serious medical consequences as the result of these three incidents.

However, the evidence provided by Defendants refute Plaintiff's allegations. First, Defendant Yeager's affidavit establishes that Plaintiff was on the "hitching post" or Lieutenant's bench for no more than five minutes. Furthermore, in an email Plaintiff sent to the Warden on December 24, 2013, at 9:05 a.m., Plaintiff complained that Defendant Yeager had spoken with him and other inmates in an unprofessional manner at 8:00 a.m. that morning and sent them to the bench in front of the Lieutenant's office. The email continues by noting that the compound officer had let them continue on their way. ECF No. 74-2 at 45. Given that the email was sent just over one hour after

17

the conversation began with Defendant Yeager, and given that Plaintiff walked to and from the Lieutenant's bench, before logging into his inmate account to write the email, it is clear that Plaintiff could not have been on the bench for hours upon hours as alleged by Plaintiff in his complaint. ECF No. 1 at 12.

In addition, even if Plaintiff sat on the "hitching post" for as much as three hours on April 19, 2014, and April 24, 2014, without water or bathroom facilities, those deprivations, alone do not constitute cruel and unusual punishment. In fact, complaints of being denied food, water and toilet facilities for six hours does not amount to a constitutional violation. See Jemison v. Deboo, No. 1:11cv47, 2011 WL 10604777 *6 (N.D. W. Va. Dec. 7, 2011) aff'd by Jemison v. Deboo, 471 Fed. Appx. 207 (4th Cir. 2012).

Furthermore, although Defendant does have a number of medical issues,[8] some or all of which may be serious, there is no evidence that Plaintiff suffered any serious or significant physical or emotional injury from the three incidents in question. Although Plaintiff alleges that he suffered a sunburn and dehydration as a result of the April 19, 2014 incident and caught a "touch of pneumonia," as a result of the April 22, 2014 incident, none of those conditions pose a serious or significant physical or emotional injury. Furthermore, the medical records do not support his allegations. Plaintiff was seen in Health Service on April 25, 2014, less than one week after both incidents, and the clinical encounter makes no mention of any complaint of sunburn or pneumonia. Moreover, although Plaintiff alleges that the three incidents in question served to exacerbate his

---

[8]Medical records establish that Plaintiff suffers from: (1) Chronic post-traumatic headache; (2) Dizziness and giddiness; (3) Hyperparathyroidism; (4) Hypertension; (5) Other and unspecified hyperlipidemia; and (6) Sickle-Cell trait. ECF No. 74 at 6. It also appears that Plaintiff suffers from posttraumatic stress disorder after having been shanked in the head., which appears to have happened in February of 2012. Id. at 4–5. Finally, it also appears that Plaintiff suffers from a history of pituitary tumor, frontal/temporal headaches and some passing out. ECF No. 85-4 at 13.

chronic illnesses, again the medical records do not support that allegation. The clinical notes from April 24, 2014, establish that while not improved, his conditions remained the same. ECF No. 74-9 at 14. In fact, the first record, after the incidents, establishing a worsening of any condition is a clinical encounter on June 26, 2014, which indicates that his hypertension had worsened due to stress. Id. at 39.[9] Finally, although Plaintiff alleges that these three incidents caused or exacerbated his lung cancer, he provides no support for this bald assertion.[10] Accordingly, the undersigned proposes that the Court dismiss Plaintiff's Eighth Amendment Claims.

### E. Retaliation

In order to sustain a claim based on retaliation, Plaintiff "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams v. Rice. 40 F.3d 72, 75 (4th Cir. 1994). Additionally, a plaintiff alleging that a government official retaliated against him in violation of a constitutional right must demonstrate, *inter alia*, that he suffered some adversity in response to her exercise of protected rights. American Civil Liberties Union of Maryland, Inc. V. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993). Therefore, "*in forma pauperis* plaintiffs who claim that their

---

[9]It is pertinent to note that on March 17, 2014, before the alleged incidents on April 19, 2014 and April 22, 2014, a clinical encounter established that his hypertension had worsened as had his hyperlipidemia. ECF No. 85-4 at 11.

[10]With respect to Plaintiff's allegation that the incidents on the "hitching post" caused or exacerbated his lung cancer, the undersigned notes that its not clear that Plaintiff even has been diagnosed with lung cancer. A clinical encounter, dated May 11, 2015, from FCI Allenwood indicates only that Plaintiff, who was then 55 years old, with 20 pack a year smoking history, had a chest CT on May 1, 2015, for a history of a 7 mm nodule of right mid lung. Because there was now a 1.6 x 1.2 cm triangular shaped nodule in the right mid lung, which could represent a nodule that is increased in size, a pulmonology consult for biopsy consideration was requested. ECF No. 85-4 at 29.A radiology report, dated October 14, 2015, references an irregular mass in the right lobe of the lung and indicates that malignancy is suspected and biopsy is recommended. ECF No. 92-1 at 2. However, nothing in the record remotely suggests that any possible malignant lung tumor is related to Plaintiff's time on the "hitching post," and the obvious cause would seem to be Plaintiff's history of smoking.

constitutional rights have been violated by official retaliation must present more than naked conclusory allegations of reprisal to survive [§ 1915(e)(2)(B)]." Id. Furthermore, claims of retaliation are treated with skepticism in the prison context. Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996).

Here Plaintiff alleges that staff retaliated against him after he filed grievances, and this retaliation was meant to deter him from filing additional grievances. Specifically, Plaintiff alleges the retaliation included being sent to the "hitching post," verbal abuse, an increase in his IFRP payments, the issuance of a false disciplinary report against him, being sent to the Special Housing Unit ("SHU") and freezing his pay. However, even if true, none of these "acts of retaliation" state a constitutional violation.

First, federal inmates have no constitutional right to participate in the BOP's administrative grievance procedure. See Adams v. Rice, 40 F.3d 72, 73 (4th Cir. 1994) (no constitutional right to the grievance procedures). Therefore, claims such as Plaintiff's that BOP employees retaliated against him for pursuing his complaints through the administrative process, are not appropriate claims in a Bivens action.

Next, to the extent Plaintiff alleges that he was sent to the "hitching post" in retaliation for filing grievances, he has again failed to state a constitutional violation. As discussed above, Plaintiff has not established a violation of his Eighth Amendment right to be free of cruel and usual punishment.

Likewise, Plaintiff allegation that staff cursed at him does not state a viable claim of retaliation. Mere verbal harassment does not give rise to a constitutional violation. See Wagner v. Wheeler, 13 F.3d 86, 92-93 (4th Cir. 1993) (verbal abuse does not amount to a constitutional

violation); McBride v. Deer, 240 F.3d 1287, 1291 n. 3 (10th Cir. 2001) (officers threatened to spray inmate with mace; taunts and threats are not an Eighth Amendment violation); Eury v. Angelone, No. 01-cv-257, 2001 WL 24042606, at *4 (E.D. Va. June 11, 2001) (alleged derogatory racial remarks, even if true, are not constitutional violations).

In addition, Plaintiff does not have a constitutional right to be free from false disciplinary reports. "The act of filing false disciplinary charges does not itself violate a prisoner's constitutional rights." Lewis v. Viton, No. 07-3663, 2007 WL 2362587, at *9 (D. N.J. Aug. 14, 2007) (citing Freeman v. Rideout, 808 F.2d 949, 962-53 (2d Cir. 1986)). There simply is no constitutional right to be free from being falsely accused. See McClay v. Fowlkes, No. 1:07cv1080, 2008 WL 3992637, *4 n.6 (E.D. Va. Aug. 27, 2008) ("To the extent the plaintiff claims that he was falsely accused, he fails to state a § 1983 claim because '[t]he prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.") (internal citations omitted); Anderson v. Green, No. 082708, 2009 WL 2711885 *4 (D. Md. Aug. 24, 2009); Riggerman v. Ziegler, No. 5:11-0868, 2012 WL 4119674, *5 ( S.D. W.Va. Aug. 22, 2012) (inmates have no constitutional right prohibiting false charges against them).

Moreover, Plaintiff does not have a constitutional right to be free from administrative detention in the SHU. In this matter, Plaintiff alleges that Defendant Yarber placed him in the SHU because Plaintiff complained about Defendant Weaver's actions on the previous day. To establish a due process violation, Plaintiff must prove "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 483–84 (1995). An inmate has no liberty interest in avoiding confinement in administrative segregation. Beverati v. Smith, 120

F.3d 500 (4th Cir. 1997). Here, Plaintiff has made no showing that his placement in the SHU is either a condition which exceeded his sentence in an unexpected manner or which created an atypical or significant hardship in relation to the ordinary incidents of prison life. See Redman v. Kilgore, No. 5:08-0081, 2011 WL 830060, at * 4 (S.D. W.Va. Jan. 14, 2011). In addition, to the extent Plaintiff claims Defendants violated policy statements or regulations in placing him in the SHU, he again fails to state a due process claim. A Bivens action "must be founded upon a violation of constitutional right," Arcoren v. Peters, 829 F.2d 671, 676 (8th Cir. 1987), and a "failure to adhere to administrative regulations does not equate to a constitutional violation." Hovater v. Robinson, 1 F.3d 1063, 1068 n. 4 (10th Cir. 1993) (citing Davis v. Scherer, 468 U.S. 183, 194 (1984)); Petway v. Lappin, No. 5:06-cv-135, 2008 WL 629998, at *5–6 (N.D. W.Va. Mar. 5, 2008) (allegation that prison officials violated policy statements and operating procedures in holding inmate in administrative segregation did not state a due process claim).

As well, Plaintiff's allegation that his inmate pay was frozen does not rise to the level of a constitutional violation. As this Court has recognized, the law is well established that a prisoner does not have a constitutionally protected right to work while incarcerated – or to remain in a particular job once assigned. Boyles v. W. Va. Dep't of Corrections, No. 5:12cv182, 2013 WL 5728143, at *2 (N.D.W.Va. Oct. 22, 2013.). "Prisoner work assignments are matters within the discretion of prison officials, and denial of employment does not, in an of itself, abridge any constitutional right of the inmate. Id. (citing Johnson v. Krable, No. 88-7729, 1988 WL 119136, at *1 (4th Cir. 1988).

The same is true about a prisoner's pay grade or any benefit that stems from the prison job, such as an apprenticeship program. See Goodman v. McBride, No. 5:06cv00523,  2007 WL

1821090, at *2 (S.D. W. Va. June 22, 2007) ("If an inmate has no constitutionally protected interest in maintaining a particular job assignment, then, *a fortiori*, he has no constitutionally protected interest in any benefit that may stem from maintaining a particular job assignment."). Accordingly, because Plaintiff has no constitutional right to any particular job or its benefits, this claim fails to establish a viable claim of retaliation.

Finally, Plaintiff's claims regarding the IFRP fail to state a constitutional violation. The IFRP was enacted to assist an inmate "to meet his or her legitimate financial obligations"[11] and applies to "all inmates in federal facilities." 28 C.F.R. § 545.10. "The IFRP program serves valid penological interests and is fully consistent with the Bureau of Prisons' authorization, under the direction of the Attorney General, to provide for rehabilitation and reformation." Johnpoll v. Thornburgh, 898 F. 2d 849, 851 (2d Cir. 1990). Further, while the petitioner's failure to comply with the IFRP can have negative consequences on the inmate, see 28 C.F.R. § 545.11(d), compelled participation in the program neither is punitive in nature nor violates due process because it is reasonably related to the legitimate government objective of rehabilitation. Johnpoll, 898 F. 3d at 851. Therefore, the IFRP has been "uniformly upheld against constitutional attack." McGhee v. Clark, 166 F. 3d 884, 886 (7th Cir. 1999). To the extent Plaintiff alleges that his payment plan was impermissibly altered, his remedy is to file a habeas petition pursuant to 28 U.S.C. § 2241. See Snyder v. Butler, No. 1:13-cv-27993, 2014 WL 3565984, at * 2 (S.D. W. Va. June 11, 2014) ("A federal prisoner's challenge to scheduled restitution payments under the IFRP is properly raised in a petition for a writ of habeas corpus under 28 U.S.C. § 2841.").

*F. Racial Motivation*

---

[11] Fines are inmate financial obligations. 28 C.F.R. § 545.11(a)(3).

In his response to Defendants' Motion to Dismiss or for Summary Judgment, Plaintiff alludes to the <u>Dred Scott</u> decision and states that "[D]efendant's (sic) is this action, did believe that the plaintiff and other African American inmates that were housed at their institution, that the 'inmate' were their personal property . . . as in 'Chattel' or 'Livestock'! (sic). Accordingly, it appears that Plaintiff is attempting to raise a claim that Defendants' actions in this case were racially motivated.

Plaintiff may not use his memorandum in opposition to Defendants' motion for summary judgment to amend his complaint. <u>See</u> <u>Swann v. Source One Staffing Solutions</u>, 778 F. Supp.2d 611, 622 (E.D. N.C. 2011) (citing <u>Barclay White Skanska, Inc. v. Battelle Mem'l Inst.</u>, 262 Fed.Appx. 556, 563 (4th Cir. 2008) (unpublished)); <u>Car Carriers, Inc. V. Ford Motor Co.</u>, 745 F.2d 1101, 1107 (7th Cir. 1984); <u>Bratcher v. Pharm.Prod.Dev., Inc.</u>, 545 F.Supp.2d 533, 542-43 (E.D. N.C. 2008). "[A]t the summary judgment stage, the proper procedure for plaintiff is to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P 15(a). A plaintiff may not amend [his] complaint through argument in a brief opposing summary judgment." <u>Artis v. U.S. Foodservice, Inc.</u>, No. ELH-11-3406, 2014 WL 640848, at *19 (D. Md. Feb. 18, 2014) (quoting <u>Gilmour v. Gates, McDonald & Co.</u>, 382 F.3d 1312, 1315 (11th Cir. 2004)).

Furthermore, as previously noted, under the Prison Litigation Reform Act (PLRA), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983, or any other federal law, must first exhaust all available administrative remedies. 42 U.S.C. § 1997(e)(a). Here, to the extent Plaintiff did file grievances, he never once raised the issue of racial discrimination as a factor. Therefore, Plaintiff has not given the BOP the opportunity to investigate any such charge of racial motivation, and accordingly, this Court lacks jurisdiction to consider the same.

*IV. CONCLUSION & RECOMMENDATION*

For the reasons set forth, the undersigned **RECOMMENDS** that the Defendants' Motion to Dismiss, or in the alternative, Motion for Summary Judgment (ECF No. 73) be **GRANTED**. It is further **RECOMMENDED** that Plaintiff's Motions (ECF Nos. 82, 87, 89, 90 and 91) be **DENIED AS MOOT**. Finally, it is **RECOMMENDED** that this mattered be **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief can be granted.

Within fourteen (14) days after being served with a copy of this recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of any objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to this recommendation will result in waiver of the right to appeal from a judgment of this Court based upon such recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984) *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is directed to send a copy of this report and recommendation, via certified mail return receipt requested, to the *pro se* plaintiff at his last known address as reflected on the docket sheet, and to any counsel of record, as applicable.

ENTER: November 2, 2015.

_/s Michael John Aloi_
MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE